UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                             :

UNITED STATES OF AMERICA,           :

          - against -               :     06 CR 893 (KMK)

YAW NKETIA,                      :

          Defendant            :

-------------------------------------------------------------- x

**MEMORANDUM OF LAW IN
SUPPORT OF YAW NKETIA'S
MOTION FOR A NEW TRIAL**

**DAVID MEISTER
JASON C. SPIRO
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
(212) 878-8537**

*Attorneys for Defendant*
Yaw Nketia

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 2

I.    The Government's Motive Theory At Trial Depended On Proving That
Mr. Nketia's Business Increased Dramatically Over Time ............................... 2

      A.    The Government Provided The Defense With Inaccurate Evidence Prior
To Trial And Persuaded The Court To Admit It Over The Defendant's
Objection ........................................................................................ 2

      B.    The Government Emphasized The Inaccurate Volume Evidence To
Convince The Jury Of Mr. Nketia's Guilt ................................................. 4

II.    The Newly Discovered Evidence ..................................................................... 6

ARGUMENT ...................................................................................................... 8

POINT I.  MR. NKETIA SHOULD BE GRANTED A NEW TRIAL BECAUSE HIS
CONSTITUTIONAL RIGHTS UNDER BRADY WERE VIOLATED .................... 8

      A.    This Court Has Jurisdiction Pursuant To 28 U.S.C. § 2241 And Fed. R.
Crim. P. 33 ..................................................................................... 9

          1.    Jurisdiction Under 28 U.S.C. § 2241 ................................................ 9

          2.    Jurisdiction Under Fed. R. Crim. P. 33 .............................................. 11

      B.    The Government Was Obliged To Disclose The E-Filing Records Before
Trial ............................................................................................. 11

      C.    The Government's Duty To Disclose Extends To All Persons Acting On
The Government's Behalf ..................................................................... 12

      D.    The Government's Disclosure Of The Suppressed Tax Filing Evidence
Would Have Made A Different Result Reasonably Probable ........................... 13

      E.    The Government's Attempt To Downplay The Significance Of The Newly
Discovered Evidence Should Be Rejected ................................................. 17

POINT II.  MR. NKETIA SHOULD BE GRANTED A NEW TRIAL UNDER RULE 33,
REGARDLESS OF THE CONSTITUTIONAL VIOLATION ............................. 19

CONCLUSION ................................................................................................ 21

i

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................... passim

*Chambers v. United States*, 106 F.3d 472 (2d Cir. 1997)............................................. 9

*Dickerson v. Louisiana*, 816 F.2d 220 (5th Cir. 1987) ................................................ 9

*Hensley v. Municipal Court*, 411 U.S. 345 (1973) ................................................ 10, 11

*Jones v. Cunningham*, 371 U.S. 236, 243 (1963) ....................................................... 10

*Justices of Boston Municipal Ct. v. Lydon*, 466 U.S. 294, 300 (1984)........................ 10

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................. 12, 14

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) .......................................................... 9

*Pennsylvania v. Ritchie, 480 U.S. 39* (1987) .............................................................. 8

*Poindexter v. Nash*, 333 F.3d 372 (2d Cir. 2003) ....................................................... 9

*Roccisano v. Menifee*, 293 F.3d 51 (2d Cir. 2002) ...................................................... 9

*Stantini v. United States*, 140 F.3d 424 (2d Cir. 1998).............................................. 10

*United States v. Arthur*, 367 F.3d 119 (2d Cir. 2004)............................................... 10

*United States v. Bagley*, 473 U.S. 667 (1985) ............................................................ 8

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) ...................................................... 13

*United States v. Mocombe*, 98 Cr. 770, 2000 U.S. (S.D.N.Y. April 24, 2000) ........... 10

*United States v. Morell*, 524 F.2d 550 (2d Cir. 1975) ............................................... 12

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)............................................ 8

*United States v. Sanchez*, 813 F.Supp. 241 (S.D.N.Y. 1993) ................................... 12

*United States v. Seijo,* 514 F.2d 1357 (2d Cir. 1975) ..................................... 13, 17, 18

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ........................................ 12, 20

*United States v. Vozzella*, 124 F.3d 389 (2d Cir. 1997).............................................. 17

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) ...................................... 14, 17, 18

*United States v. White*, 371 F. Supp. 2d 378 (W.D.N.Y. 2005) ................................... 10

*United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997) ................................. 20

*Wedra v. Thomas*, 671 F.2d 713 n.1 (2d Cir. 1982) ..................................... 12

**Statutes**

28 U.S.C. § 2241 .......................................................................................... 9, 10

28 U.S.C. § 2255 .......................................................................................... 9, 10

**Rules**

Fed. R. Crim. P. 33 .................................................................................. 1, 9, 11

Fed. R. Ev. 404(b) ......................................................................................... 2

## PRELIMINARY STATEMENT

Yaw Nketia's conviction for aiding and assisting the preparation of seven false tax returns was based on wholly inaccurate evidence as to the volume of Mr. Nketia's tax filings over a several year period. In what we now know was a major misstatement of the true facts, the Government asserted that Mr. Nketia's electronic tax filings increased by more than 100% when the word reached potential clients that he would help them cheat on their taxes. The misstated evidence supported the Government's theory that Mr. Nketia's tax return business grew dramatically based on his reputation for filing false tax returns, and then decreased when he became aware of the IRS' investigation. Unbeknownst to the defense and the jury during the trial, however, records from an IRS database show that Mr. Nketia's electronic tax return filings were relatively constant during the relevant period. Thus, the Government's *sole* motive theory was simply, and undeniably, invalid.

Mr. Nketia was unaware of these IRS records prior to August 2007. This evidence was plainly important and exculpatory, and the Government's failure to disclose the evidence to Mr. Nketia was a violation of the Government's *Brady* obligations. As discussed below, had this evidence been presented to the jury it would have seriously undermined the Government's motive theory, destroyed the credibility of its investigation, and likely would have produced a different jury verdict. In addition, regardless of the violation of Mr. Nketia's constitutional rights under *Brady*, the Court should grant a new trial pursuant to Fed. R. Crim. P. 33 based on this newly discovered evidence, because the interest of justice so requires.

## STATEMENT OF FACTS

I.    **The Government's Motive Theory At Trial Depended On Proving That Mr. Nketia's Business Increased Dramatically Over Time**

A.    **The Government Provided The Defense With Inaccurate Evidence Prior To Trial And Persuaded The Court To Admit It Over The Defendant's Objection**

The Indictment charged Mr. Nketia with eight counts of aiding and assisting the filing of a total of eight tax returns of his clients, six in 2003 (tax year 2002), and two in 2001 (tax year 2000).[1]  The returns were electronically filed, or "e-filed", via Mr. Nketia's personal Electronic Filer Identification Number ("EFIN").  According to the charges, the returns contained false information to claim earned income tax credits and refunds for the clients.

The fact that only the taxpayer in each of the eight instances, not Mr. Nketia, had a financial incentive to falsify the return was an Achilles heel for the Government, which it sought to resolve with evidence of skyrocketing growth in Mr. Nketia's business.  Prior to trial, the Government advised the defense of its view that evidence of the number of returns Mr. Nketia prepared beyond those alleged in the Indictment was directly relevant and probative of the charges.  (Meister Decl. ¶ 3, Ex. B).[2]  In an "abundance of caution," the Government provided notice of such evidence pursuant to Fed. R. Ev. 404(b), asserting that the evidence would also be admissible under this alternative evidentiary theory.  (*Id.*).

Just before trial, the Government provided the defense with four binders of documents.  The binders included, among other things, IRS "RPVUE" records reflecting the number of returns purportedly filed by Mr. Nketia for each of the years 1998 through 2005.  (Meister Decl.

---

[1]    The Indictment originally charged fourteen counts but the Government moved to dismiss six of the counts, presumably because of the Government's inability to prove them.

[2]    "Meister Decl." refers to the declaration of David Meister, dated October 9, 2007.

2

¶ 4, Ex. C).  These IRS records were marked as GX 39 through GX 46, one for each tax year. (Meister Decl. ¶ 4, Ex. D).

The defense moved *in limine* to preclude evidence of the total number of returns that Mr. Nketia filed each year.  The defense argued that admission of such evidence would constructively amend the Indictment because the charges were limited to returns filed for tax years 2000 through 2002, and that the evidence was not relevant for similar reasons.  (Meister Decl. ¶ 5, Ex. E).

In response to the motion, the Government acknowledged that Mr. Nketia charged the same price to a client -- $100 -- regardless of whether the client's return contained false information.  The Government asserted that evidence "concerning the growth in volume of the defendant's business" was "probative of the defendant's motive for committing the charged offenses: namely, his efforts to build a high volume tax return business by getting his clients refunds."  (Meister Decl. ¶ 6, Ex. F).  According to the Government, given that Mr. Nketia charged a small flat fee for each return,

> [t]he way he made money was by preparing a large number of returns.  In fact, certain of the Government's witnesses are expected to testify that they went to Nketia specifically because they had heard that he got his client's [sic] large refunds.  *The rapid growth in Nketia's business over the years that the Indictment alleges he was preparing fraudulent returns provides significant evidence of why the defendant would knowingly commit a federal crime when he stood to gain relatively little money for each specific offense.  Evidence that he prepared an expanding volume of such returns, most of which claimed refunds, is highly probative of that motive.*

(*Id.*) (emphasis added).

3

On the basis of the Government's proffer, the Court denied the motion and allowed the Government to introduce the volume evidence.

**B.      The Government Emphasized The Inaccurate Volume Evidence To Convince The Jury Of Mr. Nketia's Guilt**

During the trial the Government repeatedly emphasized to the jury that the increasing volume of returns filed by Mr. Nketia proved his motive and intent to help file the eight false returns charged in the Indictment.    At the very beginning of its opening statement, after acknowledging that Mr. Nketia did not charge "high fees," the Government explained its motive theory to the jury:

> To make money, he needed business.  He needed lots of business. And you will hear he managed to do just that.  In his first year, in 1998, you will hear that he filed only 264 electronic returns.  Over the next few years, he gained thousands of customers.  By 2002 he filed 3,974 electronic returns on behalf of his clients.  So how did the defendant manage to build up this business?  How did he manage to become the guy who everyone went to when it was tax time?  Well, he did this because nearly every customer who went to the defendant got a refund.  They got a refund whether they were entitled to it or not.

(Tr. 26-27). [3]

IRS Agent Jeanne Moisa described for the jury how the IRS electronic filing system works, how a tax preparer would be required to register with the IRS in order to file electronically, and how electronic returns are stored by the IRS.  (Tr. 41-46).  The Government also presented eight taxpayer witnesses who testified that Mr. Nketia had assisted them with

---

[3]        "Tr." refers to the transcript of the trial in this matter.

4

filing false returns, all of which were filed electronically.[4] (Tr. 47; GX 1, 3, 8, 9, 10, 11, 12, 13). To prove that Mr. Nketia had the incentive to assist the taxpayers who filed false returns, the Government introduced the RPVUE records that purported to reflect the number of returns he filed each year. (GX 39-46). Agent Moisa described the IRS RPVUE computer records of returns filed under Mr. Nketia's social security number, identified as a tax identification number. (Tr. 51). Agent Moisa knew who prepared a "couple of" the RPVUE reports but did not know who prepared the "beginning ones." (Tr. 53).[5]

The Government offered a summary chart of the tax return volume evidence (GX 101) through IRS Agent Denise Lamond. (Tr. 443; Meister Decl. ¶ 8, Ex. G). Agent Lamond explained that she prepared the summary chart, which she said reflected only returns that were electronically filed under Mr. Nketia's EFIN. (Tr. 453).

In its closing arguments, the Government explained how the volume evidence conveniently supported the Government's prosecution theory. In particular, the Government used IRS agent testimony and the RPVUE records to represent that the number of returns e-filed by Mr. Nketia's business, which began in or about 1998, steadily grew and then, remarkably, more than doubled from 2002 to 2003. Thus, the Government asserted that Mr. Nketia's motive was to "buil[d] a reputation in the community as someone who could get you a big refund," and as a result "the customers came flocking to his door." (Tr. 500). Referring to the RPVUE

---

[4]     The Government also offered evidence of a meeting between an undercover IRS agent and Mr. Nketia during which Mr. Nketia told the IRS agent that she could not claim as dependents her children living outside of the United States. (Tr. 218-19). Mr. Nketia presented scenarios to reduce her tax liability based on the number of dependents she claimed. (Tr. 198-200; GX 26-A-26-C). Ultimately, Mr. Nketia's office prepared a return containing purportedly false dependent information, supplied by the agent. (Tr. 210-12).

[5]     Presumably, the "beginning ones" are GX 39-42, which appear on their face to have been prepared in 2002, and GX 43-44, which appear to have been prepared in 2004. The prosecutor has advised counsel that the earlier RPVUEs cannot be reproduced because the IRS no longer has the underlying data. (Meister Decl. ¶ 13).

5

records (GX 39-46), the Government stated that, "[i]n 1998 when he started e-filing returns, he filed 264 returns. The next year 760. For the tax year 2001 over 1,800. For tax year 2002 over 3,000 returns were electronically filed and most of his customers got refunds." (*Id.*) The Government pointed out that "even at $100 a return," there was much money to be made: "Look at [Mr. Nketia's] math. 260 returns at $100, $2,600. By 2000 at that rate 1400 returns $140,000. In 2002 with a number of returns he filed even at just $100 a piece that is $397,000." (Tr. 501). This peak in volume was followed by a sudden downturn, which the Government told the jury was explained by Mr. Nketia then learning that he was under IRS investigation. The Government reasoned that in 2004, after Mr. Nketia heard about the IRS investigation, he knew he had "to clean up his act and his numbers went down substantially . . . because he couldn't continue to file these fraudulent returns." (Tr. 501). In its rebuttal summation, the Government reiterated that the IRS analyses and summaries were "important" evidence ignored by defense counsel because it provided "damning evidence of guilt." (Tr. 528).

The highlight of the Government's closing arguments with respect to the volume proof was the depiction of the inaccurate evidence in the summary chart (GX 101), which seemed to make the point, quite effectively, that the Government was indeed correct – Mr. Nketia's business took off because he was willing to file false returns, and then dropped to a reasonable level once again, after he became aware that he was under investigation. Little did the jury know that the chart was entirely misleading.

## II.     The Newly Discovered Evidence

As a tax return preparer Mr. Nketia used the services of "TaxWise," a company that provides tax preparation software and electronic filing services. Following Mr. Nketia's conviction, his new counsel was provided with an exchange of correspondence between

6

TaxWise and his former counsel, dated March 28, 2007. Based on the TaxWise letter, Mr. Nketia used TaxWise services to electronically file far fewer returns than indicated by the Government's trial evidence. (Meister Decl. ¶ 9, Ex. H).

New counsel then contacted TaxWise in an effort to obtain further information about Mr. Nketia's use of TaxWise, and spoke with a TaxWise employee. The TaxWise employee agreed to report back after a check of their relevant records. (Meister Decl. ¶ 10). During a subsequent conversation, however, the TaxWise employee alerted counsel that his co-worker had taken it upon himself to contact someone at the IRS with respect to the figures in question, and that the IRS had confirmed to the co-worker that IRS records of the number of returns filed under Mr. Nketia's EFIN were substantially the same as the figures reflected in TaxWise's records. (*Id.*).

Those conversations gave counsel reason to believe that certain IRS records that had never been disclosed contradicted the Government's evidence and materially undercut the Government's theory at trial. Unable to obtain such records, counsel telephoned the Government to inquire as to whether such records existed. (Meister Decl. ¶ 11). Although such records were apparently then unknown to the prosecutors, later the same day one of the prosecutors confirmed the existence of IRS records that had never been disclosed to defense, and that reported the number of returns filed under Mr. Nketia's EFIN. (*Id.*). According to these newly discovered IRS records (Meister Decl. ¶ 11, Ex. H), Mr. Nketia electronically filed substantially fewer returns than reflected in the Government's evidence, its summary charts, and in the Government arguments to the Court and jury. (*Compare* summary chart of newly discovered evidence with Government's summary chart introduced at trial, Meister Decl. ¶ 12, Exhibits J and G).

While the prosecutors themselves were previously unaware of the newly discovered IRS records, counsel does not know whether the IRS agents or witnesses affiliated with this matter

7

were aware of such records.  Obviously, at least some IRS officials had prior knowledge of records in the possession of the IRS.  Counsel understands that neither Mr. Nketia nor his prior counsel was previously aware of such records.  (Meister Decl. ¶ 15).

**ARGUMENT**

**POINT I**

**MR. NKETIA SHOULD BE GRANTED A NEW TRIAL BECAUSE
HIS CONSTITUTIONAL RIGHTS UNDER BRADY WERE VIOLATED**

It is well settled that the Government has an affirmative duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to "turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie,* 480 U.S. 39, 57 (1987).  The Government violates *Brady* if it fails to turn over material exculpatory or impeachment evidence, and there is a reasonable probability that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007) (the *Brady* obligation is "designed to serve the objectives of both fairness and accuracy in criminal prosecutions . . . it recognizes the possibility that the evidence on which the prosecution relies to prove the defendant's guilt is not necessarily truthful, accurate, or complete, especially when the prosecution's investigations have made it aware of evidence or information that might be favorable to the defense in controverting the Government's proofs").

As discussed further below, Mr. Nketia's motion for a new trial should be granted because the Government failed to disclose IRS records in its possession, which, had they been disclosed, would have created a reasonable probability of a different outcome. *See Brady*, 373 U.S. at 87 ("suppression by the prosecution of evidence favorable to an accused upon request

8

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *Leka v. Portuondo*, 257 F.3d 89, 106 (2d Cir. 2001) (finding the Government's failure to disclose witness information would have created a reasonable probability of a different outcome, where the testimony would have called into question the reliability of the Government's witnesses, and "would have furnished the defense with promising lines of inquiry for the cross-examination").

### A.    This Court Has Jurisdiction Pursuant To 28 U.S.C. § 2241 And Fed. R. Crim. P. 33

As a threshold matter, this Court has jurisdiction with respect to Mr. Nketia's motion for a new trial.

### 1.    Jurisdiction Under 28 U.S.C. § 2241

A writ of habeas corpus pursuant to 28 U.S.C. § 2241 is available to defendants who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Such habeas corpus relief is available "regardless of whether final judgment has been rendered and regardless of the present status of the case pending against him." *Dickerson v. Louisiana*, 816 F.2d 220, 224 (5th Cir. 1987). The key questions are whether habeas corpus relief is available pursuant to 28 U.S.C. § 2255,[6] and if not, whether "'the failure to allow for collateral review would raise serious constitutional questions.'" *Poindexter v. Nash*, 333 F.3d 372, 378 (2d Cir. 2003) (quoting *Jiminian v. Nash*, 245 F.3d 144, 147 (2d Cir. 2001)).

---

[6]    Typically, prisoners bring habeas corpus petitions to challenge the constitutionality of a sentence pursuant to section 2255, which provides that a federal prisoner may seek "release[] upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Conversely, section 2241 petitions are typically reserved for challenges to the execution of a sentence. *See Roccisano v. Menifee*, 293 F.3d 51, 57 (2d Cir. 2002) (recognizing examples such as challenges to calculations by the Bureau of Prisons, or decisions to deny parole, or conditions of confinement). However, in the limited circumstances where section 2255 is not available, courts characterize habeas corpus challenges to the constitutionality of a conviction pursuant to section 2241. *See Chambers v. United States*, 106 F.3d 472, 475 (2d Cir. 1997).

9

In the instant case, section 2255 is not available to Mr. Nketia pre-sentence, so the Court has jurisdiction to consider his constitutional *Brady* evidence challenge pursuant to section 2241. *See Stantini v. United States*, 140 F.3d 424, 426 (2d Cir. 1998) (characterizing a motion for a writ of habeas corpus as a section 2241(c) motion because section 2255 was unavailable pre-sentence); *United States v. White*, 371 F. Supp. 2d 378, 383 (W.D.N.Y. 2005) (recognizing that the unique circumstances of the case warranted jurisdiction to hear a section 2241 motion, where the Sixth Amendment violation was "stark and obvious", and "it would be a colossal waste of judicial resources to compel both the defendant and the Government to proceed to sentencing and appeal to raise th[e] issue"); *United States v. Mocombe*, No. 98-770, 2000 U.S. Dist. LEXIS 5318, at *3-4 (S.D.N.Y. April 24, 2000) (considering a habeas petition for new trial based on ineffective assistance pursuant to section 2241, where a Rule 33 motion would be untimely and a section 2255 petition would be premature).

Mr. Nketia satisfies the "in custody" requirement because he suffers from "restraints 'not shared by the public generally.'" *Hensley v. Mun. Ct., San Jose-Milpitas Judicial Dist.*, 411 U.S. 345, 350 (1973) (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)); *see Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 300 (1984) (recognizing that "the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody") (citations omitted). Courts have found such "restraints" where petitioners were (1) released on bail, *United States v. Arthur*, 367 F.3d 119, 122 (2d Cir. 2004), (2) released on their own recognizance post-conviction, *Hensley*, 411 U.S. at 350, and (3) released on parole, *Jones*, 371 U.S. at 243.

Here, Mr. Nketia is "in custody" for the purpose of section 2241 because he has been released on restrictive conditions: he signed a $100,000 personal recognizance bond, is subject to

10

pretrial services supervision, may not travel outside of the Southern and Eastern Districts of New York, and has surrendered his travel documents. *See Hensley*, 411 U.S. at 350 (recognizing a "restraint not shared by the public generally" where the petitioner was obligated to "appear 'at all times and places as ordered' by 'any court or magistrate of competent jurisdiction,'" unable to "come and go as he pleases," with his "freedom of movement rest[ing] in the hands of state judicial officers, who may demand his presence at any time and without a moment's notice").

### 2.      Jurisdiction Under Fed. R. Crim. P. 33

In addition, the Court has jurisdiction over the *Brady* motion pursuant to Fed. R. Crim. P. 33. Under Rule 33(a), a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Rule 33(b) provides that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." As described above, Mr. Nketia learned only by chance -- after counsel contacted TaxWise in August 2007 -- of the IRS records that undercut the Government's case. Prior to August 2007, he did not know that the IRS records introduced at trial were inaccurate, and had no practical way of discovering the new evidence except to ask the Government to comply with its discovery and *Brady* obligations, which the Government obviously did not do. In fact, neither Mr. Nketia nor his counsel were in physical possession of the newly discovered IRS evidence until the Governments' production on September 12, 2007.

### B.      The Government Was Obliged To Disclose The E-Filing Records Before Trial

It is undisputable that the records in question were favorable to Mr. Nketia. They eradicated the Government's theory that the remarkable growth in his business – as erroneously demonstrated by the Government's evidence -- was attributable to his criminal ways, and thus

11

was "damning evidence of his guilt". (Tr. 528). Therefore, these records should have been disclosed prior to trial pursuant to the Government's *Brady* obligations.

### C.    The Government's Duty To Disclose Extends To All Persons Acting On The Government's Behalf

While we do not dispute that the prosecutors representing the Government in this case did not have personal knowledge of the newly discovered evidence, such knowledge should be imputed to them.  As dictated by the Supreme Court, *Brady* obligations extend to all persons "acting on the Government's behalf."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (recognizing that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," regardless of good or bad faith); *see Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982) (stating that "the knowledge of a police officer may be attributable to the prosecutor if the officer acted as an arm of the prosecution").  The imputation inquiry turns on the role that the Government official played in the prosecution.  *See United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (examining the specific circumstances of the person alleged to be an "arm of the prosecutor" to determine "what the person did, not who the person is"); *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975) (imputing law enforcement agent's knowledge to prosecutors where the agent "participated actively" in the investigation and frequently sat at the counsel table during trial); *United States v. Sanchez*, 813 F.Supp. 241, 248 (S.D.N.Y. 1993) (imputing knowledge of perjury of local police officers who were deputized as federal agents and worked as part of the investigative task force).

Imputation of IRS knowledge to the prosecution team here is straightforward.  This case was investigated by the IRS, apparently since at least 2002.  The case agent was from the IRS.  Four IRS agents testified at trial.  Nearly all of the trial exhibits came from the IRS.  IRS agents

prepared the analyses of the IRS records in question. If knowledge is not imputable in this case, then it should not be imputed in any case.

Obviously, at least *some* IRS officials were *actually* aware of the records of the number of returns filed electronically under Mr. Nketia's EFIN, given that the prosecutors ultimately obtained the records from the IRS. We do not know whether any of the IRS agents associated with this case were aware of the records in question. But even assuming they were not, they quite plainly should have been, particularly given that a recurring theme throughout the trial was electronic filing of returns by Mr. Nketia using his EFIN. Indeed, IRS Agent Moisa testified in detail as to the electronic filing system and explained where electronic returns are stored in West Virginia, (Tr. 40-45), and IRS Agent Lamond testified at length about charts that she prepared (GX 101 - 104) based on Mr. Nketia's e-filings that resulted in successful filings, refunds, rejections and re-filings. (Tr. 441-52).

### D.  The Government's Disclosure Of The Suppressed Tax Filing Evidence Would Have Made A Different Result Reasonably Probable

Given that the newly discovered IRS records were material and exculpatory, and therefore should have been disclosed, the final phase of the inquiry is whether there is a reasonable probability that the evidence "would have resulted in a different outcome." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).[7] The test for "reasonable probability" is "not whether the defendant more likely than not would have received a different verdict with the

---

[7]    The analysis would change somewhat if a witness gave knowingly false testimony that the RPVUE records reflected the sum total of Mr. Nketia's electronic filings. *See United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir. 1975) (where prosecutors use false testimony via neglect, rather than misconduct, the test is "'whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction'") (*citations omitted*) (conviction reversed)*.*  Again, while we are not leveling accusations at any witness in this motion, the record on what the agent witnesses knew concerning the RPVUE records and the newly discovered evidence is incomplete.

evidence, but whether in its absence he received . . . a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Thus, it is not enough for the Government to say that there was adequate evidence upon which to convict. *Id.* at 435 n.8.

Notwithstanding the other evidence in the case, the Government faced an obvious weakness – lack of motive – and therefore repeatedly pointed out that Mr. Nketia assisted taxpayers with filing false tax returns in order to grow his business. However, as the Government must concede, its evidence at trial materially overstated that growth. Here, there is a reasonable probability that the newly discovered evidence would have affected the outcome of the trial because the jurors were unwittingly relying on inaccurate evidence, exacerbated by the Government's summary bar chart and the testimony of its summary witness, which were the cornerstones of the Government's evidence as to motive. The Government's inaccurate evidence worked to its favor because, for example, Mr. Nketia appeared to suddenly gain the business of more than 2,000 clients in 2003, which would be unexplainable growth for an established, legitimate, tax preparation business. Indeed, jurors probably relied on this evidence to convict Mr. Nketia all the more so because the Government emphasized the evidence throughout the trial. (*See, e.g.*, Tr. 26-27, 500-01, 528) (referring in opening, summation and rebuttal summation to volume evidence as proving motive). *See United States v. Wallach*, 935 F.2d 445, 458-59 (2d Cir. 1991) (evidence as to dishonesty of key witnesses met materiality standard where the Government emphasized witness's honesty during redirect and closing argument).

Most importantly, the Government's volume evidence supported the Government's *only* theory for *why* Mr. Nketia assisted the tax filers to commit fraud. Although, as the Government told the jury, motive is not an element of the offense (Tr. 500), it not surprisingly took pains to prove one:

14

> The defendant grabbed a lot of it through this scheme. He built a reputation in the community as someone who could get you a big refund and the customers came flocking to his door. In 1998 when he started e-filing returns, he filed 264 returns. The next year 760. For the tax year 2000 over 1400. For the tax year 2001 over 1800. For tax year 2002 over 3,000 returns were electronically filed and most of his customers got refunds…. [E]ven at just $100 a return, there was a lot of money to be made here. Look at Caesar's math. 260 returns at $100, $2,600. By 2000 at that rate 1400 returns $140,000. In 2002 with a number of returns he filed even at just $100 a piece that is $397,000. That is motive, building a business through getting people refunds that they were not entitled to and having the customers flock to your door.

(Tr. 500-01).

Without proof for that theory, the picture presented to the jury would have been far different, and the evidence of motive would have been slim at most.[8] Had jurors learned that Mr. Nketia's electronic filings *did not* significantly accelerate, or rise to any marked peak, a reasonable juror probably would have questioned why Mr. Nketia would knowingly help taxpayers file false tax returns without any personal financial benefit. Had the jury then been presented with the *accurate* evidence, they would have seen simply that Mr. Nketia's filings, not surprisingly, increased somewhat after he first obtained an EFIN in late 1999 (Tr. 45), and then grew in a measured way to a fairly constant level, consistent with a small growing business but without the dramatic growth that the Government used to convict. (Meister Decl. ¶ 12, Ex. J).

Moreover, the Government's explanation of the sharp *decrease* in the number of returns filed after 2003 would have added more fuel to the defense's fire, had the *Brady* evidence been

---

[8] Even assuming that the undercover tape hit its mark, such evidence was admitted on a limited basis, and did not *directly* support the charges in the case. Moreover, the undercover evidence, which concerned whether or not Mr. Nketia helped the undercover agent file one return for the flat fee, had nothing to do with *motive*.

15

disclosed. The Government seized upon the decrease by arguing that it was the natural result of Mr. Nketia learning that he was under investigation. (Tr. 501). The sudden decrease, so the logic of the argument went, was explained only by assuming that the business had previously been supported by false returns, and that Mr. Nketia "clean[ed] up his act" after he learned that he was being watched. (*Id.*) But if challenged with the *Brady* evidence, the Government's argument would have not only lost all force because there was no real drop off at all, it would have worked against the Government. Taking the Government's argument to its logical conclusion, once Mr. Nketia knew he was under scrutiny he filed *only legitimate returns*, which means that the number of returns filed in 2004 (for tax year 2003) was a rough average base line for Mr. Nketia's legitimate business. According to the accurate IRS records, Mr. Nketia electronically filed 1,510 returns in 2004, not noticeably out of line compared to the 1,713 returns in 2002 and 1,860 returns in 2003. The differences in these numbers would hardly support an argument based on dramatic increases or decreases. Indeed, regardless of when he learned of the IRS investigation, Mr. Nketia's business remained fairly constant, tending to show that it *never* was supported by fraud.

In light of the blatant errors exposed by the *Brady* evidence there is also a reasonable probability that the *Brady* evidence would have affected the outcome of the trial for the simple reason that its presentation would have shaken the jury's confidence in the prosecution. For the tax year 2002 alone, the same year as six of the eight counts in the Indictment, there is a discrepancy of more than *2,000* returns. The jury would not have been able to rely on IRS records of the number of returns (the RPVUE records), and certainly would have no reason to trust the other IRS records, or the Government's summary evidence and analyses, or the IRS agent witnesses who testified as to IRS records, processes and procedures, all of which the

Government relied on to prove the charges. *See United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997) (recognizing a withheld witness statement indicated the falsity of Government's records that would have tended to exculpate the defendant); *see also Wallach*, 935 F.2d at 458 (framing the question as whether "'the jury probably would have altered its verdict if it had the opportunity to appraise the impact of the newly discovered evidence not only upon the factual elements of the Government's case but also upon the credibility of the Government's witness'") (quoting *Seijo*, 514 F.2d at 1363-64).

### E.    The Government's Attempt To Downplay The Significance Of The Newly Discovered Evidence Should Be Rejected

Although it concedes it cannot "currently offer a definitive explanation for the discrepancy," the Government now takes a stab at an explanation by pointing out that the RPVUE records are based on Mr. Nketia's Tax Preparer Identification Number (or social security number) and thus reflect *both* manually and electronically filed returns, while the newly discovered evidence is based only on his EFIN, and thus reflect only electronically filed returns. (*See* Letter dated September 12, 2007, from Todd Blanche to the Court). In other words, the Government is claiming for the first time that Mr. Nketia manually filled out by hand and mailed the *thousands* of extra returns listed on the RPVUE records that are not reflected in the newly discovered evidence.

The Government's attempt to re-write the trial record to explain away the inaccuracies should be rejected. This was a case principally about *electronically* filed returns, not manually filed ones. All of the returns charged in the Indictment were electronically filed. Indeed, the proof showed that it made much more sense to electronically file tax returns because the process was quick and simple, and that Mr. Nketia would encourage e-filing through the IRS "rapid

17

refund" program to obtain expedited refunds. (Tr. 370). Of course, the Government's theory was that there was a much more sinister reason to file electronically. The Government told the jury that Mr. Nketia pushed clients to file electronically because he learned that "you can use the IRS's e-filing system to learn if a child is good or not. The defendant is using the e-filing system like a lottery machine." (Tr. 500).

There was no mistaking the Government's position at trial. The Government quite plainly presented the volume evidence to the jury as the volume of returns *electronically filed* by Mr. Nketia. (Tr. 500). IRS Agent Lamond testified that she prepared the summary chart (GX 101), based on the RPVUE reports (GX 39-46), which according to her reflected electronic filings only. (*See* Tr. 443) (explaining that "the number up top 3,974, that is the number of tax returns e-filed by Yaw Nketia in 2002"). On cross, Agent Lamond reiterated that the returns on the summary chart -- GX 101 -- were all electronically filed, and that she did not know how many "total returns he prepared for that year 2002," or the "records of the returns that he prepared that were not e-filed". (Tr. 452-53).

To be sure, the Government went to the jury on the basis that the returns reflected in the RPVUE reports were all electronically filed. Whether the Government might choose to try its case differently now does not matter. The Government is stuck with the position it took at trial, and cannot shift to a new one now. The Court should resolve the question of whether the *Brady* evidence would have impacted the outcome in the context of the Government's evidence and characterization thereof at trial, not on its shaky after-the-fact attempts to explain away the errors in its evidence. *See Wallach*, 935 F.2d at 458 (In reversing conviction Court considered predicted impact of the jury learning that witness had perjured himself at trial on a collateral matter); *Seijo*, 514 F.2d at 1364 (same).

18

Moreover, the Government's explanation makes no sense at all, and certainly would not have been accepted by a reasonable juror. Taking the Government's explanation to its logical conclusion, and comparing the figures on the newly discovered evidence with the figures in the RPVUE reports, Mr. Nketia prepared by hand and manually filed a total of roughly 100 paper tax returns for the three tax years 1999 through 2001. Then, based on the Government's new theory, Mr. Nketia suddenly changed his business practice without explanation and manually filed *2,122* paper tax returns, all for the tax year 2002 (presumably many by April 15), which would have been more than double the number he electronically filed for that same year. For tax year 2003, he suddenly changed his practice back again and filed almost entirely electronically, and fewer than 200 returns manually. Of course, none of that makes sense. The Court should reject this unsupported and unlikely explanation for the Government's inaccurate and misleading trial evidence.[9]

## POINT II

### MR. NKETIA SHOULD BE GRANTED A NEW TRIAL UNDER RULE 33, REGARDLESS OF THE CONSTITUTIONAL VIOLATION

Even aside from the constitutional violation under *Brady*, Mr. Nketia's discovery of new evidence warrants a new trial under Rule 33 in the interest of justice. *See* Rule 33(b) (providing "newly discovered evidence" as a basis for granting a new trial in the interest of justice). This Court has broad discretion to decide whether newly discovered evidence warrants a new trial

---

[9]    The IRS's website includes information for RPVUE reports. According to the site, the RPVUE command code accesses the current year *or* the three prior years data, which raises the question whether the RPVUE figures were inflated simply because they covered more than one year. *See* http://www.irs.gov/irm/part2/ch02s51.html#d0e190107. We are quick to concede, however, that we do not know whether the option of preparing an RPVUE report for the prior three years data resulted in the inaccuracies in the trial evidence. We may never know because of the lack of information concerning the key RPVUE reports that were presented to the jury and that formed the basis for the Government's summary charts and arguments.

"because its vantage point as to the determinative factor-whether newly discovered evidence would have influenced the jury-has been informed by the trial over which it presided." *Stewart*, 433 F.3d at 296.

"When a trial court learns of newly discovered evidence after a conviction, it should grant a new trial if the defendant makes a showing that the evidence is in fact new, *i.e.,* it could not have been discovered, exercising due diligence, before or during trial, and that the evidence is so material and noncumulative that its admission would probably lead to an acquittal." *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (internal quotation marks omitted).

As discussed above, the IRS records in question were newly discovered, inasmuch as they were held only by the IRS all along. In addition, the evidence at trial concerning the growth in Mr. Nketia's business over time grossly overstated the true facts, and was a cornerstone of the Government's case. Without that proof, the Government would have been left without a motive theory. Moreover, had the true facts been presented to the jury, the credibility of the Government's case would have been seriously undermined. For these reasons, and for the additional arguments discussed above concerning the predictable impact of the newly discovered evidence on the outcome of the case, we submit that the newly discovered evidence, if exposed in the context of the trial, would have probably resulted in an acquittal.

Respectfully, the interest of justice therefore requires an order granting Mr. Nketia a new trial.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Nketia's motion for a new trial.


Dated: New York, New York
       October 9, 2007

                                   Respectfully Submitted,

                                   CLIFFORD CHANCE US LLP

                                   _____
                                   BY:    DAVID MEISTER (DM-0942)
                                          JASON C. SPIRO (JS-2420 )

                                   *Attorneys for Defendant Yaw Nketia*
                                   31 West 52nd Street
                                   New York, NY 10019
                                   (212) 878-8000

21